**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| KARTIK PATEL and PMK CORPORATION d/b/a BUDGET 8 INN, | Civil Action No.: 1:23-cv-1495 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| CONSOLIDATED CITY OF INDIANAPOLIS/MARION COUNTY; CITY OF INDIANAPOLIS DEPARTMENT OF BUSINESS AND NEIGHBORHOOD SERVICES; ABBEY BRANDS in her official capacity; AMY WUNDER in her official capacity, and CHARLES ASKEW, in his official and individual capacities, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Kartik Patel ("Patel") and PMK Corporation d/b/a Budget 8 Inn ("PMK", and collectively with Patel, "Plaintiffs"), by and through their attorneys, file this civil rights action, pursuant to 42 U.S. Code § 1983, against defendants Consolidated City of Indianapolis/Marion County (the "City"), the City of Indianapolis Department of Business and Neighborhood Services ("BNS," and collectively with the City, the "City Defendants"), Abbey Brands ("Brands"), in her official capacity as Director of BNS, Amy Wunder in her official capacity as BNS Administrator ("Wunder"), and Charles Askew in his individual capacity and his official capacity as a BNS License Administrator ("Askew," and together with Brands and Wunder, the "Individual Defendants"), for violating Plaintiffs' rights to procedural due process under the Fourteenth Amendment to the Constitution of United States and Article I § 12 of the Indiana Constitution. Plaintiffs also assert claims against the City Defendants under the Indiana Tort Claims Act for tortious interference with contractual relationship, intentional interference with business relationship, and defamation. In support of their claims, Plaintiffs allege as follows:

## **Nature of the Action**

1. This action arises from Defendants' campaign to shut down Plaintiffs' hotel in violation of Plaintiffs' due process rights under the United States and Indiana constitutions, and in violation of City ordinances and Indiana statutes, while interfering with Plaintiffs' contracts and business relationships with their hotel guests and publicly disseminating false and defamatory statements that plaintiff Patel had been arrested. Not surprisingly, Defendants' actions have had a devastating effect on Plaintiffs' finances and business reputation. Plaintiffs have brought the present action to obtain financial compensation and restore their wrongfully besmirched good names in the community.

2. Since 2015, Plaintiffs have operated the Budget 8 Inn Hotel (the "Hotel") on the troubled east side of Indianapolis. Through Plaintiffs' efforts, the Hotel has become a much-needed asset to that community. Those efforts have included making rooms at the Hotel available for free or at a discount to individuals trying to get back on their feet. Indeed, the Hotel often provides the only safe haven for individuals and families in the community, many of whom are in transition to a more permanent living situation.

3. Plaintiffs worked independently and with the City to address what the City has deemed to be an excessive number of 911 calls by Hotel guests, successfully keeping the call ratio at a level below the threshold set by the City when calculated consistent with the language of the Revised Code of the Consolidated City of County of Indianapolis/Marion County ("Revised Code"). Nonetheless, Defendants decided that the time had come to shut down the Hotel.

4. On January 18, 2023, Plaintiffs applied to renew their annual license to operate the Hotel. While the application was still pending, Defendants sent a City social worker to talk to Hotel guests under the guise of providing information about City services, but who instead surreptitiously told guests that the Hotel was shutting down.

5. The following day, Defendants issued a decision denying the Hotel's license renewal application based in part on false information. *Despite knowing that the Hotel's license would remain in effect for what could be months while the decision was appealed*, Defendants ordered Plaintiffs by email to stop taking guests immediately and to shut down the Hotel within 60 days. Upon receiving the email, plaintiff Patel promptly advised Defendants that the denial was based on inaccurate information. Nonetheless, Defendants took it upon themselves to begin the process of shutting down the Hotel—effectively and improperly rescinding the Hotel's operating license immediately without notice or hearing. Defendants directed police and other City officials to go door-to-door at the Hotel and tell guests falsely that they would have to leave because the Hotel was no longer licensed to operate. Although Defendants later admitted their mistake, the damage had been done. A large number of guests vacated the Hotel before their stay ended, and the Hotel experienced a substantial drop in new guests.

6. To further damage Plaintiffs' business and reputations, Defendants also held out to the public that Patel had been arrested and that Patel lied about the arrest in the Hotel's license renewal application, knowing that these assertions were false.

7. Defendants' interference with their business, false statements, and violation of Plaintiffs' civil rights have caused Plaintiffs to suffer significant monetary damages and damage to reputation. Patel has also suffered ongoing mental anguish and emotional distress arising from Defendants' intentional and malicious violation of his rights, and resulting reputational damage. Plaintiffs demand compensation for lost revenue and earnings, mental anguish, emotional distress, and punitive damages, as well as attorneys' fees and costs pursuant to 42 U.S. Code §§ 1983 and 1988.

**Parties**

8. Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

9. Plaintiff Patel is domiciled in Indiana and maintains his permanent residence in Brownsburg, Indiana but has been living at the Hotel (Budget 8 Inn, 6850 E. 21st Street, Indianapolis, IN 46219) full-time with his wife, son, and mother since March 2020.

10. Plaintiff PMK is a corporation organized under the laws of Indiana, and maintains a principal place of business at 6850 East 21st Street, Indianapolis, Indiana 46219.

11. Plaintiff Patel and his wife own all of the outstanding shares of PMK.

12. Defendant City is a consolidated municipal government located within, and duly chartered under, the laws of the State of Indiana, with its seat of government located at 200 East Washington Street, 2501 City-County Building, Indianapolis, Indiana 46204.

13. Defendant BNS is the administrative agency responsible for granting, renewing, revoking, denying, and suspending hotel licenses on behalf of the City, and is located at 1200 Madison Ave, Suite 100, Indianapolis, Indiana 46225.

14. Defendant Brands is the Director of BNS and, upon information and belief, is domiciled and maintains a permanent residence in Indianapolis, Indiana.

15. Defendant Amy Wunder was an Administrator at BNS during all relevant times. She is currently the Deputy Director of Construction and Business Services at BNS. Upon information and belief, Wunder is domiciled and maintains a permanent residence in Indianapolis, Indiana.

16. Defendant Askew is a License Administrator with BNS and, upon information and belief, is domiciled and maintains a permanent residence in Indianapolis, Indiana.

**Jurisdiction and Venue**

17.    This Court has federal subject matter jurisdiction over Plaintiffs' claims asserting violations of federal constitutional rights under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction).

18.    This Court can and should exercise supplemental jurisdiction over Plaintiffs' state law claims, which arise out of the same transactions and occurrences as Plaintiffs' federal claims, pursuant to 28 U.S.C. § 1367(a).

19.    Personal jurisdiction is proper in this Court because all the Defendants reside and are domiciled in this judicial district.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because all Defendants reside in Indiana, and the City, its agencies, and its political subdivisions are located in this judicial district, wherein a substantial part of the events, actions, and omissions giving rise to Plaintiffs' claims occurred.

**Factual Allegations**

**The Hotel**

21.    On August 31, 2015, PMK purchased a shuttered hotel property located at 6850 East 21st Street on Indianapolis' east side.

22.    Patel, who owns PMK with his wife, invested roughly $3.85 million to purchase, renovate, enhance, and rebrand the Hotel as the Budget 8 Inn Hotel.

23.    With the City's approval, Plaintiffs re-opened the property on December 22, 2016.

**Plaintiffs and the Hotel: Vital to the Community**

24.    Since re-opening the Hotel, Patel has undertaken significant efforts to support the surrounding community and its residents.

25.     The Hotel has offered its guests long-term stays, frequently serving as a safe haven for individuals and families who are in transition to a more permanent living situation.

26.     Patel makes rooms at the Hotel available at a discount to local churches that assist individuals and families to get back on their feet.

27.     The Community Alliance for the Far Eastside also relies on the Hotel to provide housing assistance to residents of the local community.

28.     Patel frequently makes rooms at the Hotel available for free to individuals in particular need when funding for their stays is not otherwise available.

29.     Patel also makes substantial donations to support the communities in which his hotels are located.  For example, Patel donated $20,000 in Visa gift cards to the Indianapolis Public Safety Foundation so Indianapolis Metropolitan Police Department ("IMPD") officers could give the gift cards to local residents in need in an effort to build relationships in their communities.

30.     Patel was also presented with the 2018 East District Crime Fighter of the Year Award by the IMPD in August 2018 for his efforts in working with the IMPD and local officials to help reduce crime on the east side of Indianapolis.

**The "Calls for Service Ratio"**

31.     In 2018, the Indianapolis City Council passed an ordinance intended to address public safety concerns at hotels in the City that were considered to be hot spots for calls to emergency services.  *See* Title IV ("Business and Commercial Regulation and Licenses"), Chapter 901 ("Hotels and Places of Lodging") of the Revised Code, §§ 102, 204, and 303-04.

32.     The Revised Code requires BNS to calculate a "calls for service ratio" for each hotel in the City, which allows BNS to identify hotels considered to have an unacceptably high number of emergency calls.  *See* Revised Code § 901-102.

33.     To calculate the "calls for service ratio," BNS uses 911 data to determine the number of calls originating from within a hotel and "divide[s that] by the number of rooms in service at the hotel." *See* Revised Code § 901-102.

34.     The Revised Code defines "calls for service" as "the total number of ***calls to law enforcement or the fire department*** that result in a request that a representative be dispatched or directed to the hotel, over a one year period, when those responses:  (1) Result in a representative being dispatched or directed to the hotel; (2) Allege evidence of criminal activity; (3) Result in an arrest, charge or citation; or (4) Find an imminent threat to safety of persons or property." *See* Revised Code § 901-102 (emphasis added).

35.     If the "calls for service ratio" for a hotel exceeds 2.5 for a one-year period, the Revised Code requires BNS to put the hotel on probation.  *See* Revised Code § 901-303(a).

36.     "Any hotel that enters a probationary period [must] complete meetings, separately or combined, with police, fire, health, and zoning officials to discuss issues related to the property contributing to ***criminal activity*** and actions to mitigate them and limit their impact."  *See* Revised Code § 901-303(b) (emphasis added).

37.     BNS has the discretion not to renew a hotel's license ***if***, "[f]or any hotel operating in a probationary period, the calls for service ratio is at or above 2.5 over any one year period after entering probation."  *See* Revised Code § 901-204(e)(4).

**Unwanted Scrutiny of the Hotel and BNS by the Local Media**

38.     The Hotel is located in a troubled area on the east side of the City.

39.     Plaintiffs do not dispute that the Hotel receives frequent visits from police and other emergency services, however, a significant number of 911 calls from Hotel are not related to criminal activity.

40.     On June 7, 2021, local news reporter Zach Myers emailed BNS Chief Communications Officer Brandi Pahl to request information for a story about a shooting that occurred at the Hotel that morning.

41.     Myers requested "information on the current status of the motel, as it relates to the city's 'problem hotel' ordinance… Based on the number of emergency runs within a year's time" and whether "the motel currently [is] in good standing, or [on] any kind of probationary status, etc.?"

42.     License and Data analyst Andrew Jaworski provided Pahl with the calls for service ratio at the Hotel, which was 2.09 at the time, and advised that it is "important to note that most locations have received more calls than usual since the pandemic began."

43.     Askew also advised Pahl that the Hotel was "in good standing with their license expiring 1/22/2022," and that "BNS has not had any reported concerns about this location."

44.     Askew also noted that "[w]e collect data for runs made by citizens or guests of the hotel. There possibly could be a high number of runs but if requested by staff of the hotel those are not counted against them."

45.     On June 7, 2021, Pahl responded to Myers as follows:

> The Budget 8 Inn is currently in good standing as they have not reached the 2.5 runs per room ratio that would place them on probation and require them to adopt a mitigation plan.
>
> They are currently sitting at 2.09 runs per room. Attached is the data we have, we only have IMPD and IFD runs. It is also important to note that these are calls made by citizens or guests of the hotel/motel. There could be a high number of runs, but those that are requested by staff of the hotel/motel are not included in our formula.
>
> Their license expires on January 22, 2022 – at which time DBNS will take into consideration any complaints and data that we have collected before issuing a renewal.

46.     On the evening of June 7, 2021, CBS4 News published an article authored by Myers.[1]

47.     Although Pahl stated that the calls for service ratio for the Hotel was below the threshold for probation and the Hotel was in good standing, the article reported that the Hotel "has become a 'hot spot' for drugs, overdoses and various other crimes associated with drug activity."

48.     The article also noted that "data from [BNS] only includes IMPD and Indianapolis Fire Department calls," and that the "city's hotel and motel ordinance formula does not factor in emergency calls from motel or hotel employees."

49.     The article further reported that "a sign could be seen posted outside the Budget 8 Inn office door" which stated:

> If you need police assistance:
> Notify the office.
> 911 calls made from rooms may result in your being asked to leave
> (without a refund).
> $50 penalty will apply

50.     The article ended quoting Pahl's statement:

> "The Budget 8 Inn's license expires on January 22, 2022," Pahl said in a statement. "At which time DBNS will take into consideration any complaints and data that we have collected before issuing a renewal."

51.     On August 10, 2021, Patel met with Askew and Jaworski to discuss these issues and ensure that BNS was properly tallying the calls for service at the Hotel.

---

[1] Zack Meyers, *City records show hundreds of emergency calls to motel on Indy's east side*, CBS4 News (Jun. 7, 2021), https://www.latimes.com/politics/story/2020-03-19/calls-mount-making-november-mail-in-ballot.https://cbs4indy.com/news/indycrime/city-records-show-hundreds-of-emergency-calls-to-motel-on-indys-east-side/

52.    Patel provided the telephone numbers for the rooms at the Hotel and the private cell phone numbers of employees to assist BNS in identifying calls that came from the Hotel's rooms and the Hotel's staff.

53.    On or about December 13, 2021, Myers contacted Pahl asking for an update on the license status of the Hotel, and requested the 911 data collected by BNS and the number of runs per year that BNS was going to use to determine if the Hotel would be put on probation.

54.    Pahl asked Askew how to respond and said she thought that the information Myers sought was for the local television news that evening because Myers had given BNS a deadline to respond to his inquiry of 1:30pm that afternoon.

55.    Askew spoke with BNS Administrator Amy Wunder before responding to Pahl.

56.    Ninety minutes later, Askew responded to Pahl that if Plaintiffs submitted an application for renewal, they would consider putting the Hotel on probation.

57.    Upon information and belief, Askew and Wunder decided BNS would put the Hotel on probation, at least in part so that BNS would not be portrayed unfavorably in the local news.

**BNS Puts the Hotel on Probation as Wunder and Askew had Planned**

58.    On or about January 18, 2022, Patel received a letter from BNS License Administrator Charles Askew.

59.    According to Askew, the "calls for service ratio" at the Hotel was 3.19 as of the end of the one-year license term ending in January 2021.

60.    The letter indicated that the Hotel was being placed on probation for a one-year period, and asked that Patel set up a meeting with City officials to discuss how to address the issue.

61.    Patel met with Askew and other City officials on March 16, 2022.

62.    Before the meeting, Patel had already begun to implement measures to lower the "calls for service ratio" at the Hotel, which included installing a security system with live cameras linked to the IMPD, hiring additional security personnel, and maintaining a "do not rent" registry of disorderly guests, all at PMK's expense.

63.    At the March 16, 2022, meeting, Patel reported to Askew and other City officials about these efforts to lower the number of calls for service at the Hotel.

**Suspicions Arise that Defendants Are Targeting the Hotel for Closure**

64.    At the March 16 meeting, Patel again expressed concern that BNS's calculation of the "calls for service ratio" was incorrect. Among other errors, Patel pointed out that BNS had sometimes improperly double-counted or triple-counted calls to which more than one emergency service responded.

65.    Patel also noted that BNS counted calls originating from Hotel employees and calls for welfare checks, both of which are expressly excluded from the "calls for service" count by the Revised Code.  *See* Revised Code § 901-102.

66.    Finally, Patel observed that BNS included calls unrelated to criminal activity, such as health-related emergencies for low-income Hotel guests whose only access to healthcare is through emergency services.  Although BNS is technically allowed to include such calls in the count, Patel observed that doing so was not consistent with the purpose of Revised Code § 901-102.

67.    After the meeting, Patel provided Askew with a detailed analysis of the data showing each of the errors.

68.    Patel emailed Askew several times, attempting to demonstrate BNS's miscalculation of the "calls for service ratio" at the Hotel, to which Askew responded by letter that

BNS "would not debate the monthly data or change what has been captured" without further explanation.

69.     In light of Askew's steadfast refusal to recalculate the Hotel's "calls for service ratio" in a manner consistent with the Revised Code, Patel began to suspect that Askew was specifically targeting the Hotel for closure.

**Nonetheless, Plaintiffs Continue in Good Faith to Address the "Calls for Service Ratio"**

70.     In the following months, Plaintiffs continued to implement policies to lower the 911 call volume at the Hotel.

71.     Patel had hired off-duty police officers to patrol the property since it opened in 2016.  In January 2022, he replaced them with other personnel he believed would do a more effective job at maintaining security.  Patel also regularly patrols the property himself.

72.     Patel reiterated to Hotel employees that they should continue to assist police in their efforts to investigate any crimes at the Hotel.

73.     Patel also instructed Hotel employees to record when emergency services visited the Hotel to keep a real-time record of the "calls for service ratio."

74.     On May 10, 2022, Patel attended another meeting with BNS and other City officials at which he provided an update on the security measures being taken at the Hotel.

**A Summons is Issued Under Curious Circumstances; No One is Arrested**

75.     On July 22, 2022, an IMPD police officer observed a 911 call sign at another hotel Patel owned, the Regal 8 Motel, similar to the one Myers reported about at the Hotel.

76.     The officer asked an employee at the Regal 8 Motel about the sign and spoke with Patel over the phone.

77.    Patel told the officer about his situation with BNS and his motivation for putting up the sign.  The officer nonetheless advised Patel that the sign likely violated the law.

78.    Patel thereafter removed the sign from the Regal 8 Motel and from the Hotel.

79.    Patel met with Askew again on August 9, 2022, to further update Askew on the security measures being taken at the Hotel.  IMPD Detective Tiffany Mastin attended the meeting, together with other IMPD officials, to address the sign observed by the IMPD officer on July 22.

80.    For reasons that are unclear but troubling in light of the previous unwanted attention from the local news and subsequent events, the incident involving the sign had apparently been turned over to an IMPD Detective *to determine probable cause despite the "offense" at most constituting a misdemeanor.*

81.    Detective Mastin asked Patel "if he was gaming the system by controlling how 911 calls are made from his hotels."

82.    Patel answered that all 911 calls were being funneled through his staff to ensure that the calls were only being placed for reasons appropriate to call 911.

83.    Detective Mastin then waited almost two more months, until September 27, 2022, to complete an Affidavit for Probable Cause in connection with the sign the IMPD officer observed on July 22.

84.    By that time, however, Patel had already removed the signs.

85.    No criminal action was filed at that time.

86.    Instead, Detective Mastin emailed BNS on September 29, 2022, to request the "calls for service ratio" at the Hotel.

87.    BNS responded the same day, advising Detective Mastin that the "calls for service ratio" for the Hotel as of the end of August 2022 was 1.53 – well below the 2.5 threshold for probation required by the Revised Code.

88.    BNS emailed Detective Mastin again on October 3, 2022, to advise the Detective that data from September yielded an updated "calls for service ratio" of 1.7 – again, well below the 2.5 threshold.

89.    It was not until October 19, 2022 – *three months* after Patel spoke with the IMPD officer about the 911 signs – that the Affidavit for Probable Cause was acted upon and the City filed a criminal action against Patel related to the signs.

90.    Patel received via email a Summons issued on October 21, 2022.

91.    The Summons stated that the City was charging Patel with two misdemeanor counts of intimidation in connection with the signs.

92.    The Summons described Patel's alleged offenses as follows:

> **COUNT I:**  On or about July 22, 2022, Kartik Patel, the owner of the Regal 8 Motel, did communicate a threat to Mindy Andrew, that is: that she must leave the hotel without a refund for the cost of her hotel room, with the intent that Mindy Andrew be placed in fear of retaliation for calling 911 for assistance, a prior lawful act;

> **COUNT II:**  On or about July 22, 2022, Kartik Patel did communicate a threat to Mindy Andrew, another person, that is: that she will be asked to leave the hotel without a refund for the cost of her hotel room if she calls 911 for assistance, with the intent that Mindy Andrew engage in conduct against her will by not calling 911 for assistance;

> all of which is contrary to statute and against the peace and dignity of the State of Indiana.

93.    This again was curious as Patel was not present at the Regal 8 Motel during the incident described in the Summons.

94.     Moreover, none of Patel's employees told anyone named Mindy Andrew that she would have to leave the Regal 8 Motel for calling 911.

95.     Indeed, there is no record of any Mindy Andrew ever being a guest at the Regal 8 Motel.

96.     Prosecutors asked Patel to waive his claims against the City in connection with the Summons in exchange for a diversion plea, whereby Patel would avoid a conviction by paying a fine and performing community service.  In light of his innocence, however, Patel refused to plead to a diversion for the charged infractions.

97.     The Summons has been outstanding against Patel for roughly nine months as of the date of this Complaint, with minimal progression by City prosecutors.

98.     On May 17, 2023, Patel filed a motion to dismiss the charges, which is currently under consideration.

99.     Patel was never arrested for the offenses alleged in the Summons.

100.    Service of a Summons does not now, and never has, constituted an "arrest" under Indiana law.

101.    With the benefit of hindsight, it appears that the involvement of Detective Mastin and the issuance of the Summons was intended to further the City's efforts to target the Hotel for closure, as Patel suspected.

**The Suspicions Prove Correct**

102.    On January 18, 2023, Patel submitted an application to renew the Hotel's operating license.

103.    BNS assigned Askew to process Plaintiffs' application.

104.    Defendant Brands, who became Director of BNS on January 1, 2023, supervised Askew's and BNS's processing of Plaintiffs' application to renew the Hotel's operating license.

105.    Upon information and belief, Askew was also supervised by defendant Amy Wunder.

106.    Brand and Wunder were personally involved in internal BNS discussions regarding the license renewal application of the Hotel.

107.    The renewal application included the following question:

Has the applicant, partner or any corporate officer of the business ever been *arrested or convicted* of a felony, misdemeanor or ordinance violation other than a minor traffic charge? (emphasis added)

108.    Patel correctly responded "No" to this question.

109.    At some point before February 5, 2023, Defendants decided to deny the license renewal application and shut the Hotel down.

**Defendants Implement Their Plan: Step 1 – Denying the Renewal Application on False Grounds**

110.    On February 5, 2023, *while the renewal application was still pending*, Defendants sent a social worker to the Hotel purportedly to provide guests with information about City services available to them, including transportation and food benefits.

111.    In fact, guests at the Hotel advised Patel that the social worker told them that the City was going to shut the Hotel down.

112.    Upon information and belief, BNS provided the social worker with the information that she shared with Hotel guests.

113.    This was Patel's first intimation that BNS would be denying his renewal application.

114.    On February 9, 2023, Patel sent an email to Askew inquiring about the status of the Hotel renewal application.

115.    That same day, Askew responded by email that BNS had denied the Hotel's renewal application.

116.    The email identified five sections of the Revised Code as supporting denying the application under Revised Code §§ 901-204(b)(1), 901-204(d), 801-303(a)(2), 801-303(a)(4), and 901-204(f).

117.    It stated that the application was denied because: (1) Patel *"failed to disclose being arrested* and charged for two . . . counts of intimidation, an A Misdemeanor, under cause number 49D35-2210-CM-028423"; (2) "A letter received from the [IMPD] shows that this hotel location is *inimical to the public welfare*"; and (3) "IMPD has provided a letter to the license administrator *stating objections to the Budget 8 Inn license renewal because of concerns for public safety*." (emphasis added).

118.    Section 901-204(b)(1) provides that "[t]he administrator shall deny any application for a new license, or renewal of a license, if . . . :  (1) [t]he applicant makes a material misrepresentation of fact on the application."

119.    Patel responded to Askew's email and informed him that there was no misrepresentation on the license renewal application because he has never been arrested.

120.    Askew ignored this information and, as of the date of this Complaint, has never explained the source of the error or corrected it.

121.    Section 901-204(d) provides that "[t]he administrator shall deny any application for renewal of a license, if the licensee has failed to comply with sections 801-301 through 801-303."

122.    Section 801-303(a)(2) provides that "[a]ll licenses shall be issued upon the condition that the licensee shall: . . . (2) Conduct and maintain the licensed business and premises in such a manner that they will not create a nuisance or become inimical to the public welfare."

123.    As of the date Plaintiffs submitted the application, the Hotel's yearlong "calls for service ratio" was below 2.5.

124.    Section 801-303(a)(4) provides that "[a]ll licenses shall be issued upon the condition that the licensee shall: . . . (4) [n]ot permit any illegal activity to take place on the licensee's premises or in the conduct of the licensed business."

125.    Despite Askew's sweeping and highly insulting accusation that Patel permitted illegal activity at the Hotel, Askew provided not a single instance of illegal activity at the Hotel that Patel or any Hotel employees purportedly permitted.

126.    To the contrary, Askew was acutely aware of the substantial effort, time, and money Patel invested in order to *reduce* any criminal activity at the Hotel and serve as a resource to law enforcement to support their efforts and initiatives to reduce crime at the Hotel.

127.    Section 901-204(f) provides that "the administrator may deny any application for a new license, or renewal of a license, if a written objection detailing the reason for objection is submitted by Marion County Health and Hospital Corporation, Indianapolis Metropolitan Police Department, or the Indianapolis Fire Department, and the administrator concludes that issuance or renewal of the license would be inimical to the public welfare."

128.    Chief Randal Taylor of the IMPD submitted a letter objecting to the renewal of the Hotel's license, in part based on "observations made by the IMPD officers who participated in" meetings with Patel that Patel "has not been willing to implement any of the security and safety recommendations made by my officers."

129.    Chief Taylor's statements were directly contradicted by BNS's determination nearly a year earlier that Plaintiffs implemented a number of deterrent measures at the Hotel "to support lowering the Calls for Service Ratio and illegal activity on the property," including implementing "live link cameras to IMPD, new security officers, do not rent registry for disorderly guests, and Outreach programs providing services for those in need."

130.    Chief Taylor's statements were not accurate, and BNS knew that his statements were not accurate.

131.    Moreover, as previously noted, the Hotel's yearlong "calls for service ratio" was below 2.5 as of the date Plaintiffs submitted the application and has now decreased by 30% to roughly 1.4, both when calculated consistent with the language of the Revised Code.

**Defendants Double Down on Their Error: Effectively Shutting the Hotel Down in Conscious Disregard of Plaintiffs' Constitutional Rights and the Governing Statutes**

132.    Denial of the application to renew the Hotel's license was not effective until February 24, 2023, at the earliest, pursuant to the Administrative Adjudication Act (IC 4-21.5-3-1 through 4-21.5-3-37), which was adopted into the Revised Code via § 801-435(b). *See* IC 4-21.5-3-5(f).

133.    The Revised Code also provided Patel with 20 days to appeal the denial of the application to renew. *See* Revised Code § 801-434(b). Upon filing of an appeal, the license would remain in effect until a final decision was made on the appeal. IC 4-21.5-3-5(g).

134.    BNS and Askew were aware that the termination of the Hotel's license would not take effect, if ever, for what was likely to be several months.

135.    BNS and Askew knew, therefore, that it would be unlawful to order Plaintiffs to stop taking guests immediately.

136.    Nonetheless, Askew instructed Patel in the February 9 email that the "Budget 8 Inn is immediately prohibited from furnishing or renting guestrooms to new guests and must cease operations within sixty (60) days of a final decision."

137.    Section 901-205 provides that the license administrator "may revoke or suspend a hotel license at any time in accordance with section 801-412 of the Code, and shall follow the procedures set forth in that section."

138.    Section 801-412 of the Revised Code requires that a "license administrator shall not suspend or revoke a license under this section without first holding a license administrator's hearing to investigate and examine the qualifications and conduct of the licensee. The license administrator shall serve notice of and conduct the hearing according to the provisions of Division 2 of this article."

139.    Accordingly, BNS could not revoke Plaintiffs' license without providing notice and conducting a hearing to investigate the reasons for denial.

140.    BNS and Askew were aware of the notice and hearing requirements in the Revised Code.

141.    BNS and Askew were aware that effectively revoking the Hotel's license by ordering Plaintiffs to stop accepting new guests and advising existing guests that they would need to leave, was improper without providing advance notice and conducting a hearing.

142.    Nonetheless, on February 10, 2023, Defendants directed Andrew Merkley, an administrator with the City's Office of Public Health and Safety ("OPHS"), to go to the Hotel.

143.    Merkley was accompanied by City staff and IMPD officers.

144.    Merkley handed Patel a letter from Askew dated February 10, 2023, which stated as follows:

Pursuant to Section 801-201 of the Revised Code of the Consolidated City of Indianapolis and Marion County ("Revised Code"), the hotel license for Budget 8 Inn located at 6850 E. 21st Street, Indianapolis, Indiana, has been denied by the Department of Business and Neighborhood Services. Kartik Patel, the owner of Budget 8 Inn, has been notified of the license denial and informed of next steps for closing the hotel. At this time, Budget 8 Inn does not have a license to operate in the City of Indianapolis, as required by the Revised Code.

IMPORTANT INFORMATION FOR GUESTS: Budget 8 Inn must cease operations within sixty (60) days of a final decision. Mr. Patel must allow current guests a reasonable amount of time to vacate guestrooms (no less than one week). Mr. Patel must also allow the City of Indianapolis or any partnering organization or charities to contact current guests directly in order to provide information regarding potential resources and alternative lodging options.

The City of Indianapolis Office of Public Health and Safety ("OPHS") and the Indianapolis Metropolitan Police Department's ("IMPD") Homeless Division have been engaged to help guests connect to resources and provide information on other lodging options. Guests are not required to be assisted by OPHS or IMPD's Homeless Division if they do not wish.

If you have questions or concerns regarding potential resources at a later date, please reach out to OPHS at 317-327-4291 or email OPHSHousing@indy.gov.

145.    The statement in the letter that the Hotel no longer had a license to operate was false, as shown herein *supra*.

146.    Notwithstanding, and per Askew's instructions, Merkley, City staff, and the IMPD officers proceeded to visit Hotel guests door-to-door, falsely telling them that the Hotel was no longer licensed to operate, would be closing, and that they would have to leave.

147.    Merkley, City staff, and the IMPD officers provided guests with pamphlets containing information about alternative housing arrangements, sliding pamphlets under the doors of guests who did not answer door knocks.

148.    Per the directive in the February 10 letter, Patel stopped accepting new guests at the Hotel at 3:00 pm on February 10, 2023.

149.    The following day, on February 11, 2023, Patel received from Askew for the first time a formal order denying the Hotel's renewal application.

150.    The order, dated February 6, 2023, contained the same information, directions, and false statements as were in Askew's February 9, 2023, email.

151.    Under the terms of the February 6 Order, Patel was immediately prohibited from taking new guests at the Hotel and ordered to cease all operations within 60 days of a final decision.

**Oops: Defendants Admit their Error (Sort Of)—But the Damage Is Done**

152.    On February 23, 2023, Patel timely appealed the February 6 Order.  Once again, this meant that the Hotel continued to have a valid operating license—and continues to have one through the present.

153.    Plaintiffs do not now seek judicial review of BNS's decision to deny the Hotel's license, which is currently pending on appeal to the Board of Business and Neighborhood Services.

154.    By letter dated March 3, 2023, Patel's attorney requested a meeting with Askew to discuss the possibility of a limited and conditional grant of authority for continued operations at the Hotel during the pendency of the appeal.

155.    In the letter, PMK advised that:

> PMK is interpreting [the phrase 'cease operations within 60 days of a final decision in the February 6 Order] with a common sense definition to the effect that the decision becomes "final" when the appeal process is concluded. This would be consistent with Court rules and other protocols applicable to contested matters. If the Department of Business and Neighborhood Services ("BNS") is employing a different definition or taking a different approach, we ask that you please advise and further provide the basis for any such position.

156.    On March 7, 2023, an attorney for the City wrote Patel's counsel responding that BNS's "position has not changed" and that "all operations must cease at the hotel within sixty (60) days of the Committee's decision."

157.    The City's letter gave no indication that Plaintiffs could once again accept new guests.

158.    By letter dated March 14, 2023, Patel's attorney emailed the City attorney seeking clarification on whether Plaintiffs could take new guests.

159.    The City's attorney responded by email *admitting that the February 6 Order was stayed pursuant to the Administrative Adjudication Act*.

160.    Upon receipt of the March 14 letter, the Hotel once again started accepting new guests.  But the damage had been done.

161.    Defendants' unlawful effort to remove guests from the Hotel and begin shutting it down succeeded.

162.    Existing guests vacated the Hotel.

163.    New guests stopped coming to the Hotel.

164.    Local community organizations stopped sending people that required temporary housing to the Hotel.

165.    Because Patel complied with the express terms of the February 6 Order and did not accept new guests at the Hotel from February 10 to March 14, the Hotel experienced a substantial drop in revenue.

166.    The Hotel also lost substantial revenues due to the premature departure of guests before the end of their agreed-upon stays, caused by the actions of the City Defendants and Askew

in falsely advising guests on February 10, that the Hotel was closing and they needed to find alternative accommodations.

167.    The drop in Hotel revenue caused by Defendants' actions continues to date, as indicated by substantial decreases in year-over-year revenue for the months of February, March, April, May, June, and July of 2023.

## COUNT I

Deprivation of Right to Procedural Due Process under the Fourteenth Amendment
to the United States Constitution - Municipal Liability/Custom or Practice
*(As Against the City Defendants and the Individual Defendants in their official capacities)*

168.    Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

169.    The Fourteenth Amendment to the United States Constitution prohibits local government actors from depriving an individual of property without due process of law.  Included within this protection are the rights to notice and a hearing when a local government deprives an individual of a protectable property interest.

170.    Plaintiffs held a protectable property interest in the license to operate the Hotel and the right to engage in their business and therefore, pursuant to the Constitution of the United States, were entitled to procedural due process prior to revocation of the license, including notice, a hearing, and a right of appeal.

171.    Defendants deprived Plaintiffs' of their due process rights by ordering Plaintiffs to immediately stop taking new guests, without adequate notice, the right to appeal, or a hearing, when they denied Plaintiffs' application to renew the license to operate the Hotel.

172.    Defendants further deprived Plaintiffs' of their due process rights by sending City officials and police to the Hotel to tell guests that the Hotel was not licensed to operate and that

they would have to leave, effectively revoking Plaintiffs' license before the February 6 Order legally took effect and without adequate notice, the right to appeal, or a hearing.

173.    Defendants were acting in their official capacities under color of state law with deliberate indifference to the constitutional rights of Plaintiffs.

174.    Defendants' actions were not isolated but in accordance with a policy or practice so permanent and well-settled as to constitute a custom or usage with the force of law.

175.    Plaintiffs were deprived of their due process rights as a direct and proximate result of Defendants' actions.

176.    As a direct and proximate result of Defendants' deprivation of Plaintiffs' due process rights, Plaintiffs have suffered, and will continue to suffer, damages in the form of lost revenue, a substantial decrease in the value of the Hotel property, harm to Patel's personal reputation, harm to PMK's business reputation, emotional distress and mental anguish suffered by Patel, and attorneys' fees to defend against Defendants' improper license revocation and effective shutdown of the Hotel.

177.    Plaintiffs have also incurred, and will continue to incur, attorneys' fees in order to enforce their rights through the prosecution of this action.

### **COUNT II**
Deprivation of Right to Procedural Due Process under the Fourteenth Amendment to the United States Constitution - Municipal Liability/Failure to Train and Supervise
*(As Against the City Defendants and Brands and Wunder in their official capacities)*

178.    Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

179.    The City and BNS, as well as defendants Abbey Brands, as the Director of BNS, and Amy Wunder, as a BNS Administrator, had a duty to ensure that License Administrators,

including Defendant Askew, were trained and supervised to perform their duties in a way that did not violate the rights of members of the public protected by the United States Constitution.

180.     The City, BNS, Brands, and Wunder were aware of Askew's actions at the time they occurred.

181.     The City, BNS, Brands, and Wunder were aware or acted with deliberate indifference to whether Askew's actions described herein violated the due process rights of Patel and PMK protected by the United States Constitution.

182.     The City, BNS, Brands, and Wunder directed, approved, and/or ratified through inaction, Askew's actions described herein.

183.     The City, BNS, Brands, and Wunder failed to train and supervise Askew sufficiently to prevent and/or mitigate Askew's violation of the constitutional rights of the public, including the constitutional rights of Plaintiffs, protected by the United States Constitution.

184.     The failure of the City, BNS, Brands, and Wunder to train and supervise Askew to prevent and/or mitigate Askew's violation of the rights of the public, including the constitutional rights of Plaintiffs protected by the United States Constitution, amounts to a deliberate indifference to the constitutional rights of the public and Plaintiffs, and directly and proximately caused the deprivation of Plaintiffs' due process rights.

185.     As a direct and proximate result of the failure of the City, BNS, Brands, and Wunder to train and/or supervise Askew to prevent and/or mitigate Askew's violation of the constitutional rights of the public, including the constitutional rights of Plaintiffs, protected by the United States Constitution, Plaintiffs have suffered, and will continue to suffer, damages in the form of lost revenue, a substantial decrease in the value of the Hotel property, harm to Patel's personal reputation, harm to PMK's business reputation, emotional distress and mental anguish suffered by

Patel, and attorneys' fees to defend against Defendants' improper license revocation and shutdown of the Hotel.

186.    Plaintiffs have also incurred and will continue to incur attorneys' fees in order to enforce their rights through the prosecution of this action.

## COUNT III
Deprivation of Right to Procedural Due Process under the Fourteenth Amendment to the United States Constitution - Personal Liability
*(As Against Defendant Askew in his personal capacity)*

187.    Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

188.    Defendant Askew's actions described herein violated the due process rights of Patel and PMK protected by the United States Constitution.

189.    Defendant Askew was aware or acted with deliberate indifference to whether his actions described herein violated the due process rights of Patel and PMK protected by the United States Constitution.

190.    Defendant Askew personally and directly participated in the violation of Plaintiffs' procedural due process rights protected by the United States Constitution.

191.    Askew was acting under color of state law.

192.    Plaintiffs were deprived of their due process rights as a direct and proximate result of Askew's actions.

193.    As a direct and proximate result of Askew's violation of Plaintiffs' rights to due process under the United States Constitution, Plaintiffs have suffered, and will continue to suffer, damages in the form of lost revenue, a substantial decrease in the value of the Hotel property, harm to Patel's personal reputation, harm to PMK's business reputation, emotional distress and mental

anguish suffered by Patel, and attorneys' fees to defend against Defendants' improper license revocation and effective shutdown of the Hotel.

194.    Plaintiffs have also incurred and will continue to incur attorneys' fees in order to enforce their rights through the prosecution of this action.

**COUNT IV**

Deprivation of Right to Procedural Due Process Under Article I § 12 of the
Indiana Constitution
*(As Against the City Defendants and the Individual Defendants)*

195.    Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

196.    Article I § 12 of the Indiana Constitution provides that "[a]ll courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." Included within this protection are the rights to notice and a hearing when a local government deprives an individual of a protectable property or reputational interest.

197.    Plaintiffs held a protectable property interest in the license to operate the Hotel and the right to engage in their business, as well as a protectable interest in their reputation, and therefore, pursuant to the Indiana Constitution, were entitled to procedural due process prior to the effective revocation of the Hotel's license, including notice, a hearing, and a right of appeal.

198.    Defendants deprived Plaintiffs of their Indiana due process rights by denying Plaintiffs application to renew the license to operate the Hotel on the grounds that Patel lied about being arrested and the Hotel was "inimical to the public welfare," and by ordering Plaintiffs to immediately stop taking new guests without adequate notice, the right to appeal, or a hearing.

199.    Defendants further deprived Plaintiffs' of their due process rights by sending City officials and police to the Hotel to tell guests that the Hotel was not licensed to operate and that

they would have to leave, effectively revoking Plaintiffs' license before the February 6 Order legally took effect, without adequate notice, the right to appeal, or a hearing.

200.    Defendant Askew's actions described herein violated the due process rights of Patel and PMK protected by the Indiana Constitution.

201.    Defendant Askew was aware or acted with deliberate indifference to whether his actions described herein violated the due process rights of Patel and PMK protected by the Indiana Constitution.

202.    Defendant Askew personally and directly participated in the violation of Plaintiffs' procedural due process rights protected by the Indiana Constitution.

203.    The City and BNS, as well as defendant Abbey Brands, as the Director of BNS, and Amy Wunder, as a BNS Administrator, had a duty to ensure that License Administrators, including Defendant Askew, were trained and supervised to perform their duties in a way that did not violate the rights of members of the public protected by the Indiana Constitution.

204.    The City, BNS, Brands, and Wunder were aware of Askew's actions described herein.

205.    The City, BNS, Brands, and Wunder were aware or acted with deliberate indifference to whether Askew's actions described herein violated the due process rights of Patel and PMK protected by the Indiana Constitution.

206.    The City, BNS, Brands, and Wunder directed, approved, and/or ratified through inaction, Askew's actions described herein.

207.    The City, BNS, Brands, and Wunder failed to train and supervise Askew sufficiently to prevent and/or mitigate Askew's violation of the constitutional rights of the public, including the constitutional rights of Plaintiffs, protected by the Indiana Constitution.

208.    The failure of the City, BNS, Brands, and Wunder to train and supervise Askew to prevent and/or mitigate Askew's violation of the rights of the public, including the constitutional rights of Plaintiffs, protected by the Indiana Constitution amounts to a deliberate indifference to the constitutional rights of the public and Plaintiffs, and directly and proximately caused the deprivation of Plaintiffs' due process rights under the Indiana Constitution.

209.    As a direct and proximate result of Defendants' deprivation of Plaintiffs' due process rights, Plaintiffs have suffered, and will continue to suffer, damages in the form of lost revenue, a substantial decrease in the value of the Hotel property, harm to Patel's personal reputation, harm to PMK's business reputation, emotional distress and mental anguish suffered by Patel, and attorneys' fees to defend against Defendants' improper license revocation and shutdown of the Hotel.

210.    Plaintiffs have also incurred and will continue to incur attorneys' fees in order to enforce their rights through the prosecution of this action.

## COUNT V
### Tortious Interference with Contractual Relationship
### *(As Against the City Defendants)*

211.    Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

212.    Defendant Askew instructed police and other City officials to approach guests at the Hotel door-to-door on February 10, 2023, and tell them that the Hotel was no longer licensed, would be closing, and that guests would have to leave.

213.    At the time Askew instructed police and other City officials to approach guests at the Hotel door-to-door on February 10, 2023, and tell them that the Hotel was no longer licensed, would be closing, and that guests would have to leave, he was aware that Plaintiffs' Hotel license was still in effect, pursuant to the Revised Code and Administrative Adjudication Act.

214.    Askew was aware as of February 10, 2023, that the Hotel rented guest rooms for extended stays, which generated a substantial portion of the Hotel's revenue.

215.    Askew was aware as of February 10, 2023, that Hotel guests signed agreements governing the terms of their occupancy, including the length of their stay.

216.    Askew sent the police and City officials to the Hotel with the intention of having guests vacate their rooms.

217.    As a direct result of Askew's instructing police and other City officials to approach guests at the Hotel door-to-door on February 10, 2023, to tell them that the Hotel was no longer licensed, would be closing, and that guests would have to leave, a significant number of guests at the Hotel vacated the Hotel and stopped paying for their rooms in breach of their agreements with Plaintiffs.

218.    As a direct and proximate result of Askew's conduct in tortiously interfering with the contracts between Plaintiffs and Hotel guests, Plaintiffs lost, and will continue to lose, substantial revenues.

219.    At all material times, Askew was acting within the scope of his employment with the City Defendants in tortiously interfering with agreements between the Hotel and its guests.

<u>**COUNT VI**</u>
Intentional Interference with Business Relationships
*(As Against the City Defendants)*

220.    Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

221.    Defendant Askew instructed police and other City officials to approach guests at the Hotel door-to-door on February 10, 2023, and tell them that the Hotel was no longer licensed, would be closing, and that guests would have to leave.

222.    At the time Askew instructed police and other City officials to approach guests at the Hotel door-to-door on February 10, 2023, and tell them that the Hotel was no longer licensed, would be closing, and that guests would have to leave, he was aware that Plaintiffs' Hotel license was still in effect, pursuant to the Revised Code and Administrative Adjudication Act.

223.    Askew was aware as of February 10, 2023, that the Hotel rented guest rooms for extended stays, which generated a substantial portion of the Hotel's revenue.

224.    Askew was aware as of February 10, 2023, that Plaintiffs had valid business relationships with Hotel guests in connection with their stay at the Hotel.

225.    Many of these business relationships were not governed by contracts.

226.    Askew sent the police and City officials to the Hotel with the intention of having guests vacate their rooms.

227.    As a direct result of Askew's instructing police and other City officials to approach guests at the Hotel door-to-door on February 10, 2023, to tell them that the Hotel was no longer licensed, would be closing, and that guests would have to leave, Askew interfered in the Plaintiffs' business relationship with a significant number of guests at the Hotel who vacated the Hotel and stopped paying for their rooms.

228.    As a direct and proximate result of Askew's conduct in intentionally interfering with the business relationships between Plaintiffs and Hotel guests, Plaintiffs lost, and will continue to lose, substantial revenues.

229.    At all material times, Askew was acting within the scope of his employment with the City Defendants in intentionally interfering with the business relationships between the Hotel and its guests.

## COUNT VII

Defamation

*(As Against the City Defendants)*

230.    Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

231.    The February 6, 2023, order was drafted by, or at the direction of, Defendant Askew.

232.    The February 6 Order was issued by Askew.

233.    At the time Askew issued the February 6 Order, he was aware that the statement in the order that Patel "failed to disclose being arrested and charged for two . . . counts of intimidation, an A Misdemeanor, under cause number 49D35-2210-CM-028423" in the license renewal application for the Hotel was false.

234.    Upon information and belief, Askew distributed the February 6 Order to police, City officials, and members of the public, holding out to them that Patel had been arrested and had lied about the arrest in the Hotel's license renewal application.

235.    As of February 10, 2023, Askew was aware that Plaintiffs' Hotel license was still in effect, pursuant to the Revised Code and the Administrative Adjudication Act.

236.    On February 10, 2023, Askew instructed police and other City officials to approach guests at the Hotel door-to-door to tell them that the Hotel was no longer licensed, would be closing, and that guests would have to leave. Askew knew these statements were false.

237.    Upon information and belief, Askew advised members of the public and/or press that the Hotel was no longer licensed, would be closing, and that guests would have to leave. Askew knew these statements were false.

238.    The false statements described herein were defamatory on their face in that they harmed Plaintiffs' personal and business reputations, subjected Plaintiffs to distrust and a

perception of illegitimacy among Hotel guests, and subjected Plaintiffs to ridicule and contempt among City officials, local community leaders, and members of the public.

239.    Askew acted with malice by knowingly publishing the false statements described herein.

240.    As a direct and proximate result of Askew's false statements described herein, Plaintiffs have suffered, and will continue to suffer, damages in the form of lost revenue, harm to Patel's personal reputation, harm to PMK's business reputation, and emotional distress and mental anguish suffered by Patel.

241.    At all material times, Askew was acting within the scope of his employment with the City Defendants in publishing false statements about Patel's purported arrest and the Hotel's loss of its license.

## PRAYER FOR RELIEF

242.    WHEREFORE, Plaintiffs pray this Court grant judgment in favor of Plaintiffs and against Defendants as follows:

a.    On Count I, awarding consequential damages and damages for emotional distress and mental anguish in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $8,700,000 plus interest, attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

b.    On Count II, awarding consequential damages and damages for emotional distress and mental anguish in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $8,700,000, plus interest, attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

c.      On Count III, awarding consequential damages and damages for emotional distress and mental anguish in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $8,700,000, plus interest, attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

d.      On Count IV, awarding consequential damages and damages for emotional distress and mental anguish in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $8,700,000, plus interest, attorneys' fees and costs.

e.      On Count V, awarding consequential damages and damages for emotional distress and mental anguish in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $700,000, plus interest, attorneys' fees and costs.

f.      On Count VI, awarding consequential damages and damages for emotional distress and mental anguish in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $700,000, plus interest, attorneys' fees and costs.

g.      On Count VII, awarding consequential damages and damages for emotional distress and mental anguish in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $700,000, plus interest, attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

243.    Plaintiffs demand a trial by jury under Federal Rule of Civil Procedure 39 for all issues triable by jury.

**TOMPKINS LAW**

By:    */s/ John L. Tompkins*_____
    John L. Tompkins
    johnltom@mac.com

    608 East Market Street
    Indianapolis, IN 46202
    P: (317) 507-4838

**K&L GATES LLP**

Charles F. Rysavy
*(of counsel, pro hac vice application to be submitted)*
charles.rysavy@klgates.com

Seth I. Allen
*(of counsel, pro hac vice application to be submitted)*
Seth.allen@klgates.com

One Newark Center, Tenth Floor
Newark, New Jersey 07102
P: (973) 848-4000
F: (973) 848-4001

Robert Everett Wolin
*(of counsel, pro hac vice application to be submitted)*
Robert.Wolin@klgates.com

1717 Main Street, Suite 2800
Dallas, Texas 75201
P: (214) 939-4909
F: (214) 939-5849

*Attorneys for Plaintiffs*